Memorandum of Decision
This case presents a petition by the Department of Children and Families ("DCF") claiming that the minor child Elijah, born July 3, 1995, has been neglected. The parents of Elijah are Jessica G., the child's mother, formerly known as Jessica T., and Richard T., the child's father. "the parents were divorced on December 22, 1998.
This case has been the subject of very extensive litigation that has presented a challenge to numerous judges within the judicial system and involved a considerable expenditure of court resources. Without considering the civil and criminal proceedings in the State of Texas involving the respondent, Richard T.; the felony criminal conviction in Connecticut involving the respondent, Richard T.; and the writ of habeas corpus petition regarding the fugitive from justice charges of the respondent, Richard T. (Judicial District of New Haven at Meriden, Dorsey, J., State Trial Referee), the superior court has spent eight days devoted to an initial order of temporary custody hearing in the present case in which the order of temporary custody to DCF was CT Page 4993 confirmed on November 4, 1997 (Santos, J.). Numerous hearings have been held in the Superior Court for Juvenile Matters (Keller, C.A.J.). A civil restraining order was issued (Barall, J.). In the companion action for dissolution of marriage proceeding the superior court spent three days on visitation and restraining order issues (Levine, G, J.); time on protective orders (Bishop, J.); time on contempt and sanctions (Dranginis, J.) and two days of testimony regarding the dissolution of marriage (Gruendel, J.). In the divorce proceedings the issues of custody, visitation and support were reserved to this court for resolution as part of the neglect proceedings since the Commissioner of the Department of Children and Families had legal custody of Elijah at the time of the dissolution of marriage proceedings. As a consequence, it is the obligation of this court to resolve the neglect allegations and the outstanding issues of custody, visitation and support. Finally, this court has heard eight additional days of testimony commencing on March 15, 1999 and concluding on March 25, 1999.
This court has heard the testimony of twenty-one witnesses including the respondent mother, the respondent father, various DCF workers, psychologists, physicians, service providers and acquaintances of both respondents. The court has had the opportunity to observe the demeanor of the parties and witnesses and to assess their credibility. Based upon the testimony of the witnesses and a review of the approximately seventy-seven exhibits the court makes the following factual findings.
 Richard J. T. a/k/a Rick
The respondent Richard T. was born on December 9, 1951 in Grosse Point, Michigan. He attended the Grosse Point University School, according to his testimony "an elite school comparable to Kingswood Oxford school here in Connecticut." While in the tenth grade his father retired and the family moved to the U.S. Virgin Islands. Rick[2] completed high school and subsequently moved to New Mexico. In about 1980, Rick moved to Texas where he met and married a recent divorcee, Leslie F. B., on December 12, 1980. Rick was twenty-nine and Leslie was nineteen at the time of their marriage. Leslie had a two year old male child by her prior marriage, Richard F. There were two children born during the marriage, David, born September 6, 1981 and Michael, born May 21, 1983.
In an affidavit presented to the Tarrant County, Texas, CT Page 4994 sheriffs office, (Exhibit K) his then wife Leslie indicated that she began to be concerned in October of 1984 about Rick taking showers with one of the children. On one occasion she noticed that Davids anus was red and irritated. Upon questioning, the child said "Daddy did it" with his finger. In February of 1985 Leslie said she found Rick in the shower with David. Rick was masturbating, according to the verified affidavit. Her affidavit mentions finding the young boys, Ricky or David in bed with his father in the morning with no clothes on. In April, 1985, Leslie took the children and left Rick. David was nearly four years of age and Michael was nearly two. On July 17, 1985 the Texas child protection agency received a referral on the case of alleged child abuse.
In statements made to a psychologist and the children's mother, Leslie, the arrest warrant narrates allegations that Rick kissed David on his mouth and nose and ears ". . . and named everything including his `peeshee' all the way down to his toes. I asked if his daddy ever put anything inside of his bottom and he said his mouth." In a subsequent video taped interview by psychologist Mark Otis the child narrated that ". . . his Daddy tied his legs up with green rope and tied his hands and choked him and he said it happened in the white house and daddy took me in his bedroom. Then he went on to explaining how his daddy kissed him and pretty well indicated all over his body, he indicated the eyes, the belly button, the ears, the pee-she, the palms of his hands and the child indicated that he felt guilty and felt like he was wrong for what happened to him." Richard F., Leslie's child by her first marriage, who was then seven years of age, told the psychologist that he had witnessed Rick and young David in bed naked and Rick had his hand on Davids buttocks. On February 1, 1986, the Arlington Texas police department issued a warrant for the arrest of Rick charging him with aggravated sexual assault. (Arlington Police Department case report, Exhibit K).
In testimony before this court, Rick testified his visitation had already been seriously reduced by the Texas court. Since October of 1985, he was permitted only supervised visitation with his church members present. Church members were being questioned by the police. Rick testified he was concerned ". . . everybody was telling me that these children had been abused." Rick testified that he discussed this with his father and his father said ". . . the best thing we can do is to bring some good sense to bear." Again, Rick testified, "I thought I could bring some logic to bear." Ricks idea of a logical resolution to the problem CT Page 4995 was to take the children and run. On January 20, 1986, Rick abducted the two young children, David and Michael, during visitation and fled to St. Maarten, Netherlands Antilles. On the same day in the 297th District Court in Tarrant County, in the State of Texas a warrant was issued for Interfering with Child Custody (Exhibit A).
Leslie, the children's mother, notified the police and hired a private detective. The detective traced Rick to the local airport, to New York, then to St. Croix, to San Juan, Puerto Rico and to St. Maarten via St. Kitts. The children's mother and her father flew to St. Maarten and when Rick refused to turn the children over to their mother, Rick (and the children) were deported by the St. Maarten authorities back to San Juan. When Rick arrived back in San Juan, the U.S. authorities persuaded Rick to allow the children's mother to have the children. She returned to Texas immediately. Rick was brought to the police station and later released. Six months later Rick was arrested by the Federal Bureau of Investigation on a federal charge of unlawful flight to avoid prosecution. He was returned to Texas.
The sexual assault charges in Texas were not prosecuted, according to the testimony of Sergeant Sharon Warms of the Arlington, Texas Police Department since the mother, Leslie, would not permit the children to testify before a grand jury[3]
(Testimony of Sergeant Warms, Exhibit Q). In a negotiated plea agreement reached on August 1, 1986, Richard J. T. (Rick) pleaded guilty to two single count indictments charging him with the felony charge of Interfering with Custody, one each for David and Michael. Under Texas criminal procedure, imposition of the sentence was suspended or deferred while the adjudicated felon was placed on probation. Rick was placed on probation for ten years. As conditions of his probation he was to commit no offense against the laws of Texas or any other state of the United States. He was to have no contact with the children. He was to pay a monthly probation fee of $25.00 per month and was ordered to pay $450.00 per month per child for child support. He has not seen his two children of his first marriage since he abducted them and believes they are now living in a trailer park with "two lesbians."
On September 28, 1990, in the Criminal District Court for Tarrant County, Texas, a petition to proceed to adjudication was filed(Exhibit A). The petition charged that Rick had violated the terms of his probation by being convicted of an offense in Connecticut on January 6, 1990; by failing to report to the Adult CT Page 4996 Probation Office; by failing to notify probation of his change of address within 10 days of the move; by failing to pay his monthly probation fee; and by failing to pay child support he was allegedly in arrears $15,300 as of September, 1990. It appears that Texas has made three attempts to extradite Rick to Texas. The reasons why extradition has failed in Connecticut were not made clear to this court.
One month after pleading guilty in Texas, Rick moved to Connecticut. Little is known by the court of Rick's life between September of 1986 and December of 1989 except to say that Rick was illegally supplying controlled substances to dealers. (Testimony of Stephanie Beaulieu, Exhibit T.) On January 6, 1990, Rick was arrested in East Hartford, CT., and charged with four felony charges and one misdemeanor offense, all related to drugs. He was immediately incarcerated. On May 1, 1990, Rick was convicted in a plea agreement to a single felony charge of sale of a controlled substance, General Statutes § 21-277 (b). Rick was sentenced to four years to serve in a Connecticut Correctional Institution.
Stephanie Beaulieu, a long time friend of Rick, testified in a prior proceeding that she had met Rick before his incarceration. She testified that Rick supplied controlled substances to her boyfriend who was a "dealer." They were both friends of Rick. When Rick was imprisoned in 1990, Stephanie and her boyfriend cleaned out Rick's house to store his personal possessions. Among the possessions they found, which Rick concedes that he owned were ". . . vibrators, dirty magazines, letters, pictures, something called a spreader bar . . . [I]t was a piece of — it was a piece of long wood and it had holes in it. I think there were two of them. Some kind of vibrator thing that didn't have a plug on it, letters, phone bills, and movies that I said, all mostly having to do with like, anal," according to Stephanie (Transcript T. p 46.). Rick reclaimed those sexual devices and materials when he got out of prison after two years on September 6, 1992.
On the day he was released from prison Danny T., Ricks nephew, came to pick Rick up and bring him back to his apartment. At the apartment Rick met Danny's eighteen year old girl friend, Jessica. Danny and Jessica, who were not married, had just had a child born to them, Sylvanna. The child was one month old. Rick was forty-one years old. Within six months Jessica left young Danny to live with his uncle Rick. Rick and Jessica married CT Page 4997 November 28, 1993. She was nineteen and he was forty-two.
 Jessica
Jessica told court appointed psychologist, Robert Meier, that her mother and father had been divorced for eighteen years, that is since she was about six years of age. Her relationship with her mother was described as "rocky" and she did not get along with her father. She first left the home of her mother when she was fifteen years of age. She lived in a car for a couple of weeks and then in a tent. She moved back with her mother for a few months. She then lived in Junction 19, a home for troubled teens. At one point she attempted suicide and was hospitalized at the Mt. Sinai Hospital and later at Elmcrest Hospital. She left home for good at age 17, to work at a Burger King and ultimately that same year she met Daniel T. ("Danny") in 1991. She lived in an apartment with him and soon became pregnant. Their child Sylvanna was born on August 6, 1992. One month later she met Danny's uncle, Rick, the day he was released from prison. She described him as "family." She said that she and Danny would get marijuana from him. Over the course of the next few months Danny was working many hours to pay for the expenses of being a father. Rick would frequently come by to pay visits to Jessica, take her on trips, like to Mystic and to ". . . keep me company . . ." She became infatuated with the older, and seemingly more sophisticated, uncle. Within a few months, Jessica left Danny to live with Rick.
Jessica testified that things were very satisfactory before the marriage. As their relationship grew Rick became more controlling of her. She described his attitude and the way he wanted her to live as different. He monitored her relationships with friends and family. He had to accompany her on visits to her friends. Jessica gradually allowed Rick to become the primary caretaker for Sylvanna. If Jessica left the house without Rick and Sylvanna, Jessica was to call him when she arrived at a destination and call again before she left. She felt she could not live her life without his prior approval: "he would say "lets agree to disagree becoming more persistent and I tired of arguing with him."
 Sylvanna
Rick's care of Sylvanna started when he offered to bathe her and change her diapers. Then it became that he was rushing to be CT Page 4998 the first one there. Jessica testified she felt as if she was becoming the helper. He rushed to change her and to bathe her. At some point Sylvanna started having substantial redness in the vaginal and anal area where she had never had them before like on the buttocks. One evening she noticed Rick have an erection while playing with Sylvanna. Another time she heard Sylvanna get upset while Rick was bathing her. Jessica went into the bathroom and Rick was holding her naked on her back in his arms, parallel to the floor. Sylvanna had redness in the area of her vagina that Rick could not explain, according to Jessica.
During the marriage Jessica became pregnant and did not want another child. Things were not as they seemed, according to Jessica. She decided to terminate her pregnancy. "Rick offered for me to have the child and give it to him." She elected to have an abortion. When she became pregnant a second time she could not bring herself to have another abortion. Elijah was born on July 3, 1995.
On one occasion Jessica said she was searching in the storage shed for some of her clothing when she came upon a storage bin with a metal lid. She said she found one bin that contained sexual materials. She described some of the materials as follows: videos, photographs of naked women, photographs of him in the nude before a mirror, and photographs of him engaging in sex with other women. There were magazines with the predominant theme of sexual bondage, photographs of women in leather bondage, sexual contraptions like a rubber penis, hair clips, ropes, black leather cuff set, handcuffs padded with lambs wool, shin or calf cuffs, leather gag or mouth piece, a ball for the mouth, correspondence to other women inviting them to come to his home, stuff from the hardware store, and a tourniquet for his testicles to allow him to stay erect longer. She testified that the photos were of young women, "[Y]ounger than I was and I was 18."
Ricks explanation was that he had used them before he had found a good honest women to hang on to. Jessica said she believed it. She made him burn the magazines and photos. She admits to being intrigued by the sexual paraphernalia and further admits to consenting to some use of devices on two or three occasions. She said that as their relationship progressed Rick began to introduce himself as "the controller" or "the dominate one." She said he used handcuffs on her one time. She said sex wasn't exciting to him unless "I was hindered of movement." He would call her a whore, slut or bitch. CT Page 4999
She testified, while crying, that there were very few times she would "go to Ricks bed in a sexual way." On one such occasion Rick had fastened her legs to a board and she was limited in her movement. He insisted on anal intercourse over her objection. On another occasion when the couple were "being intimate" Sylvanna came into the bedroom and approached the bed. Jessica tried to get Rick to stop. She testified that he just held her down and continued. She said she remained quiet and didn't yell out because Sylvanna was sitting right next to her.
Another issue related to nudity in the home. Both Rick and Jessica testified to sleeping naked together. It was not an issue until Sylvanna was older and could understand body parts. When Jessica asked him not to walk around naked she said that Rick just laughed her off, as he did with the issue of taking showers with Sylvanna. Jessica thought this to be inappropriate. She testified that Rick took showers with Sylvanna when she, Jessica, was not around. Another issue was that Sylvanna would come into their bedroom and get into bed with them when Rick was unclothed. Rick testified that Sylvanna had the habit of getting up in the middle of the night and removing her pajamas. "Yes, there were times when I would wake up in the morning and I was nude and Sylvanna was nude." Under cross examination by the child's attorney, Rick was asked if he thought it was good judgment to be taking showers with a young female child here in Connecticut after the allegations of masturbating in the shower with his son in Texas. Rick replied: "Yes, the alternative was to let her run around the house unsupervised."
Under cross examination Jessica said, "What could I do? I had no money, I had no place to go. I couldn't go to my mother's. I had made my bed, I had to sleep in it."
In October or November of 1995 Jessica's suspicions about Rick's conduct with Sylvanna grew when Sylvanna complained of irritation in the genital area which did not clear up. In Dr. Meier's report Jessica said that Sylvanna had told her mother that her "pee-pee" hurt and further said that she, Sylvanna, had touched Rick's pee-pee. Jessica indicated to Rick that she wanted Sylvanna examined by a physician. Rick attempted to discourage Jessica from taking the child to a doctor. On November 7, 1995, Jessica and the maternal grandmother took the child to Dr. Steven Rigatti with suspicions of sexual abuse by the child's step-father, the household nudity of the step-father and that the CT Page 5000 child exhibited an unusual fear of ropes. The report of Dr. Rigatti notes that the child has had bizarre behavior including self-induced vomiting and regression of toilet training (Exhibit 3). Dr. Rigatti notified DCF. Rick maintains that Sylvanna's problems were a result of an injury from a picture frame that fell while Sylvanna was jumping on a bed, not as a result of his conduct.
 Separation-November, 1995
Jessica took the two children and moved out of the home. DCF advised her to permit only supervised visits for Rick and, since they were separated, DCF closed its case. Jessica moved in with her mother and lived there until May, 1996. She then moved in to her own apartment. Jessica had just turned twenty-two. She was working at a restaurant at the time and having problems with money, with rental payments and with day care. She claims that Rick was pressuring her to come back. She was dating other men. She told Dr. Meier that she found things very difficult. She was not receiving any support from Rick nor did he provide them with medical insurance. She decided to let Elijah live with Rick for three weeks and then later, in September, 1996, she let Sylvanna live with Rick. "She admitted that this was not consistent with her suspicions, but had no clear explanation of why she made this decision, but described herself as being rather desperate and homeless at the time"(Exhibit P p. 5). This was all contrary to the agreements she had made with DCF (Exhibit F.).
Approximately three months later, on December 1, 1996, Stephanie Beaulieu and her sister, Marissa, brought Marissa's son Joshua in to the Connecticut Children's Medical Center. The child was examined by Dr. Lara Katherine Wheeler, a pediatric resident at the hospital.[4] The two women, Stephanie and Marissa, identified themselves as the aunt and mother of Joshua. With them was a male who was identified as an uncle. They told the doctor that four year old Joshua had, during the past month, spent several week-ends at the home of Rick T. Marissa had been working nights and Rick had offered to care for Joshua. In Rick's testimony he said that Joshua had spent four overnight week-end visits as a playmate for Sylvanna. The hospital interview occurred on Sunday, December 1, 1996.
On the evening before, Stephanie Beaulieu, who as earlier indicated, has known Rick since the late 1980s, was giving her nephew Joshua his bath when Joshua began to disclose CT Page 5001 certain events that had occurred on the previous night at Rick's house. Dr. Wheeler indicated in her testimony before this court that, while Joshua's mother was principally narrating the events, Joshua was confirming his mothers statements and offered some details to support the explanation. Dr. Wheeler was satisfied that the child was not being coached in his responses. Dr Wheeler's progress notes reveal:
 When Joshua arrived home on sat. evening, he was taking a bath began to tell mat. aunt Stephanie that Rick had touched his private parts "he put his finger in my butt hole," "he bite my penis," "he rubbed my private parts," "he used toys in my butt" Joshua described the toys as "brown orange color that moved" He also described putting "wet stuff" on the toys. Joshua described "bracelets on his wrist that held his hands out on a wooden board . . .
Later in the notes, Joshua said that these events occurred "7, 8, or 9 times" (Exhibit E) and that Rick said the big bad wolf would get him if he told anyone. Dr. Wheeler tested Joshua for sexually transmitted diseases and for lacerations and abrasions. The test results were all negative. This court found the testimony of Dr. Wheeler to be credible and compelling.
Rick denies these allegations and says that he was not arrested, the objective physical test results were negative, that Stephanie and Marissa are both heroin addicts and that they are not credible witnesses. Joshua was later interviewed on video tape at the Department of Pediatrics at St. Francis Hospital and Medical Center. Both the tape and the report of that interview have been placed in evidence. The interview was witnessed by Middletown Police detectives and a DCF social worker. While Joshua did not make any disclosures on the tape, the interviewer's analysis of the interview noted strong elements of secrecy. "The overall impression is of a little boy who appears quite frightened to tell a secret and who is quite adept in maintaining it" (Respondent's Exhibit 5 p. 6 and Exhibit #6).
Sylvanna was video interviewed at the same Children's Center at St. Francis Hospital and Medical Center by Dianne Edell on January 9, 1997. Ms. Edell was the program director of the Aetna Foundation Children's Center which is a program in the Department of Pediatrics that evaluates children alleging sexual abuse. During the interview of Sylvanna, which was played in its entirety during this court proceeding, Sylvanna stated that she CT Page 5002 slept "nudie" with Rick at his house and that Elijah slept with his pajamas on. She said Rick was "nudie" also. She offered that something bad will happen to Rick if she tells . . . the police will come, she wouldn't tell what happened. She further indicated that her Mommy sleeps in jammies. Sylvanna also revealed that she took showers with Rick and "washed his legs and his butt." Sylvanna stated that "Rick is a bad man."
Ms. Edell described risk factors when assessing a child of Sylvanna's age, four years old. She indicated that mere nudity of an adult is not necessarily a problem per se. As children become more conscious of their own bodies and as the children develop boundaries, certain touching is inappropriate, its hard to give a cut off, but privacy boundaries must be established. A separation between parent and child must exist, according to Ms. Edell. Children have rights to their body and to their personal privacy. She testified that she was concerned that Rick's judgment as a parent was not as it should be. "It is never appropriate to wash an adult." His conduct raised numerous issues of secrecy, nudity, washing his legs and buttocks, and sleeping nude with a nude, vulnerable female child that was not his child.
Based upon her assessment of the child's credibility, based upon indicators of spontaneity, giving information from the childs perspective given the child's developmental age, giving details, the child's state of mind, interaction and general consistency in the core information, Ms. Edell recommended either no contact or supervised visitation only for Rick. This court concludes that with respect to the very credible, spontaneous testimony of Sylvanna, that even if there were no other allegations, Rick's conduct with Sylvanna alone demonstrates such poor judgement that he should be prevented from any unsupervised contact with children. The court concludes that Rick neither recognizes nor respects appropriate sexual boundaries. With respect to Sylvanna's video tape, Rick found nothing inappropriate about her statements except that she had at one point referred to him as a "bad man."
Further of extreme concern to the court are letters and documents marked as Exhibits M-1, M-2, M-3 and M-4. Exhibit M-4 is a list of photo-copied checks addressed to the U.S. Oriental Network for $78.00, to the Philippine Friendship Service for $59.00, to the U.S. Asian Connection for $117.00 and to the Asian Romance for $87.00. All the checks are dated in August of 1996. Rick does not deny that the documents and letters were written by CT Page 5003 him.
Exhibit M-3 is a list of what appears to be young women's names, their ages and country of origin. The oldest age is nineteen. The youngest is fourteen. The young women are all from Korea or Japan.
Exhibits M-1 and M-2 are photocopies of letters written by Rick to two different women within the United States. The letters can be described as graphic and coarse sexual overtures to these women, often written in the most base vernacular. A relatively direct and brief passage in the least vulgar of the terminology is recited in Exhibit M-1, as follows:
 HELLO DONNA MY NAME Is RICK [last name omitted here]. I PURCHASED YOUR NAME AND ADDRESS FROM NADS OF EL PASSO TX., WHO LISTS YOU AS A SUBMISSIVE WOMAN.
 IM A DOMINANT, HETEROSEXUAL, WHITE MALE, 44, 5'10", 185#, IM WELL HUNG AND VERY ORAL I TRULY ENJOY PROVIDING CUNNILINGUS AND ANILINGUS FOR EXTENDED PERIODS OF TIME AS WELL AS STRAIGHT AND GREEK SEX WHILE YOURE RESTRAINED.
 IM NOT A SADIST. I AM DOMINANT WITH A GREAT PROCLIVITY TOWARD RESTRAINT AND DELAYED, PROLONGED, OR DENIED PLEASURE, LITERALLY HOLDING YOU ON THE BRINK OF SEXUAL ORGASM FOR HOURS ON END.
 (Punctuation, spelling and capitalization as in the handwritten printed original)
Dr. Robert Meier, the court-appointed psychological evaluator, testified that writing these letters during a period of time when he was under scrutiny of the court regarding alleged sexual misconduct with minors, raised serious concerns about his judgement.
In reviewing the evidence, it is troublesome that the pattern of sexual domination and bondage surfaces several places, including letter in evidence written by Mr. T. His self reported preferences are consistent with the behaviors reported by both Jessica, as well as individuals in the case in Texas. There were also bondage and dominance themes in the statements of the alleged victim in December, 1996. (Joshua) It is not known how much communication there was between all of these individuals, put prompting with regard to such unusual details raises concerns. It should also be considered in deciding this case, CT Page 5004 that while he was fighting to see his children, and during one period while the children were with him, he was seeking a similar type of sexual relationship, to that of which he had been accused, openly through the mail. At least one of the documents clearly focused on young or even minor individuals. . . .
 Probably the best predictor of behavior is the individuals own history or pattern of behavior. This is true not only of sexualized or inappropriate behavior, but also other patterns. At best, the behavior of Mr. T. exhibits a pattern of irresponsibility, lack of judgment and failure to take responsibility for his own behavior. For these reasons, risk to his child cannot be ruled out given his documented pattern of behavior.
 The Defense.[5]
In response to the allegations, documents and testimony against him, Rick assembled his own team of experts. He did not submit to the sexual offender evaluation requested by DCF. Instead he went to a person known as Frank Caparulo, M.S., Caparulo Associates, Orange, CT. who referred him to several doctors in Connecticut and, ultimately, to Joseph J. Plaud, Ph.D., of Whitinsville, Massachusetts. It was through Dr. Plaud that an evaluation was conducted and a "plethysmographic assessment" was arranged through New England Forensic Associates, Inc. A report of that work was admitted as Respondent's Exhibit #38. The reports admitted into evidence have been considered by the court.
Dr. Joseph Plaud, Director of Behavioral Associates in Massachusetts testified that he administered numerous tests to Rick and that throughout all the testing there was no pattern of sexual arousal consistent with pedophilia. Further, according to his testing, Rick's pattern of sexual arousal was consistent with his stated preference of adult females, although he did respond to adult and young adolescent females. Dr. Plaud was clear that his testing does not directly determine culpability or guilt. He further indicated he was in no position to make a recommendation or comment on Rick's parenting.
Special mention should be made with respect to the testimony of John H. Felber, a West Hartford psychiatrist who testified on behalf of Rick. Felber was qualified as an expert by the agreement of the parties, based in large measure upon hiscurriculum vitae (Exhibit RJT #4). Dr. Felber testified with breathtaking audacity. In his experience, he testified, the CT Page 5005 likelihood of a wife making false allegations of sexual abuse in a divorce setting is extremely high and that in his experience in only two cases have the allegations proven to be true[6]. Accordingly, based upon his examination of Rick and his experience he testified that the allegations made by the two former wives of Rick were almost certainly false. This opinion was rendered even though Felber had never met the two women, seen their statements or psychiatrically evaluated them. His written report states that he is convinced that the allegations are "unfounded." (Exhibit #39)
Dr. Felber's bias against the petitioner, the Department of Children and Families was so pervasive as to virtually discredit his entire testimony. He had written a letter to DCF telling them that he had advised Rick not to undergo a sexual perpetrator evaluation which DCF had requested. Dr. Felber testified that "I was aware of the danger of this kind of testing . . . wrongly interpreted and wrongly applied." When asked what kind of sexual evaluation DCF had required, Dr. Felber said he did not know. When asked why he didn't call the caseworker to determine what kind of testing they were seeking, Dr. Felber replied "I would never ask DCF any question, sir. I don't trust them from here to you . . . I have too many experiences with DCF to know they are not trustworthy." He further declared a ". . . total untrustworthiness of DCF . . . as a general expression." He opined that ". . . the great majority (of DCF workers) have absolutely no ability to perform what they try to do." The reason for this he said was ". . . the personality that goes with the job."
In cross examination Dr. Felber was asked to comment on a certain "penile plethysmographic assessment" which Rick had performed upon himself.[7] The child's attorney asked Dr. Felber if he would review the transcript of his prior testimony given on October 17, 1997, before Judge Santos. Dr. Felber said he did not wish to change anything, "I wouldn't like to change one iota of any line you have there," he said. When asked specifically what is a plethysmograph, Dr Felber indicated, "[I]ts a very fancy kind of examination done by specialist in this field." He said it measures changes in volume . . . changes in tumescence.[8] "It is an instrument that measures tumescence in the male organ, at what stage the penis swells and at what stage it is flaccid." The following colloquy occurred:
Atty. McAndrews: It's your opinion, isn't it, that people who employ that test are perverts? CT Page 5006
Isn't that true?
Dr. Felber: My opinion? Who put this in your head, my God! First of all, there is no pervert.
`Perverts' is not a term which I use. I have no idea what it means. Secondly, people who do this are very good, . . . excellent, scientists. Oh, no!
Whereupon Attorney McAndrews called Dr. Felber's attention to his prior testimony of October 17, 1997, (Exhibit X, p. 109) between himself, Attorney McAndrews, and Dr. Felber.
By Atty. McAndrews:
Q. Have you ever heard of the process of taking a subject and connecting some sort of electronic mechanisms that might register the penile response to certain images on a screen?
A.(By Dr. Felber) Well, they must be perverts who do that.
Q. You've never heard of this process?
A. I have heard about this process, but I think its a perversion.
Q. You think it's a perversion, but is it recognized within the field of psychiatry as an appropriate tool —
A. No.
Q. — for examination?
A. No, it is not recognized in the field of psychiatry.
Q. It is not?
A. No, it is not.
Q. And are you —
A. Yes, I am.
Having recognized his testimony to be now completely at variance with his prior 1997 testimony, Dr. Felber stated in CT Page 5007 court on March 25, 1999:
"[A]t that time I might have thought it was a perversion, today I don't think so."
This court has great difficulty in placing any credence in the biased and inconsistent testimony of John H. Felber.[9]
With respect to the credibility of the two respondents, Jessica and Rick, the court finds that Jessica was much more willing to accept personal responsibility for her conduct, for her lies, and for the mistakes and misjudgments she has made along the way. She is also now actively undergoing personal therapy to deal with her personal issues. She actually blames Rick very little for her misfortunes during the past seven years. The court found her to be credible and reliable in much of her testimony.
With respect to Rick, the court finds that his testimony may be characterized as punctuated by deceit, denial and careful circumspection. He accepts little personal responsibility for his conduct. He demonstrates little genuine respect or affection for children or for women. He blames his father for the decision to abduct the children from Texas, so as to ". . . bring some good sense to bear."
With respect to the sexual abuse allegations of his first wife, he eagerly tells all who will listen to him that the sexual abuse allegations in Texas were "no billed" by a grand jury, as if to absolve him of the charges. He made specific attention of this information to his. friends, to this court and to all of his various evaluators. He carefully omits the critical information that his first wife did not want the children to testify before the grand jury in Texas and therefore, there was no case presented to the Texas grand jury.
On the use of his sexual devices, he gallantly offered that the only reason he used them on his second wife was to allow Jessica "to let loose and experience things, . . . to be free of her inhibitions." He further stated that he had never used "any of that stuff, never before nor since." He denied ever forcing her to have anal sex and never continued when she said to stop.
Rick's testimony in chief focused on circumventing the allegations of sexual impropriety that were directly proven; denial of allegations where less proof was available; CT Page 5008 discrediting Jessica's judgment and parenting skills; discrediting Stephanie and Marissa Beaulieu, Joshua's aunt and mother, as heroin addicts; and cultivating a theory of conspiracy and ineptitude by DCF to deny him custody. "Anyone can make a mistake, although it was pretty common of the Department of Children and Families," he offered.
The court places little credence in the trustworthiness and reliability of the testimony of the respondent-father regarding the more important issues of this case. Aside from his failure to accept any personal responsibility for his conduct, neither did he profess any regret or remorse to the victims of his very poor judgment.
 Neglect Findings: (case #DN H12-CP97-004654-A)
On November 4, 1997, the order of temporary custody placing custody in the Commissioner of the Department of Children and Families was confirmed on a finding that the child, Elijah, would be in immediate danger if he were returned to Richard T.(Santos, J.)
In accordance with the findings herein set forth and the testimony and evidence presented, and in accordance with the provisions of General Statute § 46b-129, the court finds that as of the date of the petition Elijah was a neglected child in that he was permitted to live under conditions and circumstances injurious to his well being. Specifically, the court finds that the child's father poses a sexual threat to young women and to children. The evidence clearly demonstrates that while the respondent-father is not a forceful predator, he uses guile and deceit upon young, vulnerable persons to satisfy his sexual proclivities and fantasies.
The court finds further that the the child's mother did not protect Elijah from the threat posed by the father and that at the time of the petition, the mother was herself unavailable to properly parent the child.
The court is satisfied that the mother has taken steps to reform and rehabilitate herself.
She is now in a stabile relationship, living in an appropriate setting and under-going a course of individual counseling and therapy. Pursuant to § 46b-129 (j) of the General Statutes, CT Page 5009 custody of Elijah is placed with the respondent-mother with protective supervision by the Commissioner of Children and Families for a period of one year and further subject to conditions hereinafter set forth.
 Custody, visitation and support. (case #DN FA 97-0714370S)
A dissolution of the parents marriage occurred on December 22, 1998, upon a finding by the court (Gruendel, J.) that the marriage had irretrievably broken down. The breakdown in the marriage was found to occur due to the husbands intolerable cruelty to the wife and to the wife's reasonably held suspicions that the husband was having inappropriate contact with the minor child, Sylvanna (Decree p. 2).
In accordance with the findings herein set forth and the testimony and evidence presented, and in accordance with the provisions of Chapter 815j of the General Statutes, the court finds that as of this date the statutory presumption in favor of joint custody has been rebutted by the evidence. The court specifically finds that the plaintiff-mother is a suitable and worthy person to have the sole care and custody of Elijah. Custody is awarded to her subject to the conditions hereinafter set forth.
 Visitation
With respect to the issue of visitation, it is the order of the court that the respondent father is to have no contact with the minor child Elijah until such time as he satisfies the court that he has completed a course of treatment at the Center for the Treatment of Problem Sexual Behavior[10] and that he is thereafter evaluated by such court appointed physician, psychiatrist or psychologist as the court, upon motion, may direct. The court specifically finds that visitation with father is not in the best interest of the child at this time. The court is further aware that problem sexual behavior may be a lifetime affliction and that unrestricted visitation may be inappropriate until Elijah is old enough to protect himself from unwanted sexual overtures.
 Child Support.
With respect to the issue of child support, the respondent father testified he did not file a tax return for 1991 and 1992 CT Page 5010 because he was in jail. In the decree of dissolution of marriage the court made the following relevant findings:
 The husband's claim that his earning capacity was affected by the wife's allegation that he had abused her daughter requires additional analysis. The husband is employed as a paralegal and works part time as a mortgage broker. His current income is approximately $30,000 annually. Until recently, he worked full time as a mortgage broker, both as an independent contractor and as an employee. He did not file federal tax returns for 1993, 1994, 1995, 1996, or 1997, but claimed that his income from the mortgage business at the time of the marriage in 1993 was approaching $40,000 annually.
Based upon this finding and the testimony of Rick during this trial that the pendency of these proceedings have diminished his earnings to the present level of $30,000; "I have been spending untold hours on this case for three years." And further based upon his declaration that "I have become well-versed in real estate" and at another point in his testimony, "I could make more money if I were freed from the court system." The court concludes that now that he will be "freed from the court system" his earnings will be able to increase to the $40,000 per year level. His earning capacity is found to be $40,000. "Earning capacity, in this context, is not an amount which a person can theoretically earn, nor is it confined to actual income, but rather it is an amount which a person can realistically be expected to earn considering such things as his vocational skills, employability, age and health." Lucy v. Lucy,183 Conn. 230, 234, 439 A.2d 302 (1981). Unkelbach v. McNary,244 Conn. 350, 372, 710 A.2d 717 (1998).
In determining the defendant's child support obligation under the child support guidelines, the child support obligation first is determined without reference to earning capacity, and earning capacity becomes relevant only if a deviation from the guidelines is sought under § 46b-215a-3 (b)(1)(B). Pursuant to §46b-215a-3 (a), the amount of support determined without reference to the deviation criteria is presumed to be the correct amount of support, and that presumption may only be rebutted by a specific finding on the record that the application of the guidelines would be inequitable or inappropriate under the circumstances of a particular case. When the latter is true, § 46b-215a-3 (b)(1)(B) allows deviation from the guidelines on the basis of a parents earning capacity. Unkelbach v. McNary,
CT Page 5011 supra. The plaintiff-mother of Elijah claims to earn $50 per week baby sitting. No testimony was sought or elicited to challenge this claim. The defendant-Rick claims gross income of $450 per week and itemizes deductions of $93 per week for federal withholding, social security, Medicare and State withholding. The uncontroverted testimony is that he has not filed a tax return for seven years and that neither one of his employment sources deducts any tax. It would be wholly inappropriate for this court to allow him a deduction for taxes he readily admits to not paying. Accordingly, the child support worksheet used by this court to determine his net income does not allow for any of the claimed tax related deductions.
Since the plaintiff's income is $50 per week and the defendants gross and net is claimed to be $450 per week, the combined basic obligation is $126.00 per week predicated upon combined net income of $500.00 per week. The defendant has 90% of the combined income, his portion of the child support is therefore $113.00 per week if no deviation is made. Since this court has determined that Rick will now be able to resume his former earnings of $40,000 per annum, this court determines that the application of § 46b-215a-3 (b)(1)(B) is appropriate.
Annual earnings of $40,000 will yield the defendant gross weekly earnings of approximately $769.00 per week. Since it is not Rick's habit and practice to file tax returns, no itemized deductions will be noted. If his projected earnings of $769 per week are added to the $50 the plaintiff earns, the combined weekly income is $819 per week. The guideline figure for child support predicated upon combined net weekly income of $819 per week is $199.00 per week. The defendants portion of that amount is 93% or $186.00.
Since the defendant has been found able to earn $40,000 now that he will be free of the present litigation, the court concludes that a deviation from the guidelines to reflect the defendants earning capacity is appropriate. His projected earnings are $40,000.00 per annum. Child support of $186.00 per week would diminish the defendants annual income by only $9,672 per annum leaving him with $30,328 per annum which is $583.00 per week, a sum sufficient to meet his declared financial obligations of $520.00 per week (see Financial affidavit of March 22, 1999.) Those obligations of the defendant include $198.00 per week for a mortgage on his recently acquired house. His assets show $31,250.00 of equity in house and $25,000 of cash, three motor CT Page 5012 vehicles and a $2,000 "Starcraft." The plaintiff-mother of the child needs all the assistance she can receive. She owns no house, no motor vehicle, she has no bank accounts. She lists no assets. A deviation from the guidelines is appropriate.
 ORDERS:
The defendant-father is ordered to pay weekly child support of $186.00. Pursuant to Sec. 46b-215, all orders of support shall be made through the Support Enforcement Division and shall be payable to the custodial parent, Jessica G., or the Commissioner of Administrative Services, as their interests may appear. See Sec. 17b-745 and 52-362. The Support Enforcement Division shall enforce the orders. The respondent father is further ordered to pay for Blue Cross-Blue Shield medical insurance or equivalent medical, dental, and optical insurance as available through his place of employment. Further, he shall pay one-half of all uninsured medical,. dental and optical expenses for the minor child.
 Conditions of Protective Supervision and Custody:
The respondent mother is instructed to comply with the following specific steps to retain custody:
1. Cooperate with the Department of Children and Families with respect to home visits, appointments, and recommended services
2. Participate in your present individual counseling with Catholic Family Services or such other counselor approved by DCF.
3. Keep child's and your own whereabouts known to DCF and the attorney for Elijah.
4. Maintain stable housing.
5. Avoid domestic violence.
6. Meet the educational, medical, physical and spiritual needs of the child.
7. Permit no contact between Elijah and the child's natural father Richard T., without further order of the court. CT Page 5013
The respondent father is instructed to comply with the following specific steps to regain visitation and possible custody:
1. Cooperate with the Department of Children and Families with respect to appointments, and recommended services
2. Participate in individual and group counseling with the Center for the Treatment of Problem Sexual Behavior. Follow treatment recommendations.
3. Keep your whereabouts known to DCF.
4. Respect the order of the court to have no contact with Elijah pending further treatment and evaluation.
5. Faithfully discharge your court ordered support obligation.
The Department of Children and Families is ordered to:
1. Take all steps necessary to secure the safety of the child.
2. Provide case management services.
3. Refer the respondents to appropriate services to assist meeting identified needs.
4. Assist the Center for the Treatment of Problem Sexual Behavior in developing, implementing and monitoring appropriate treatment for the respondent-father to keep children safe.
5. Monitor the safety of Jessica and for Elijah during the period of protective supervision and during the period of any extensions.
6. Comply with requirements of the Adoption and Safe Families Act.
These steps are made part of the Order of Protective Supervision of the Court for its duration.
Judgment may enter accordingly.
F.J. Foley Judge of the Superior Court CT Page 5014
[2] The respondent's given name is Richard. He has filed an appearance in this case on November 13, 1998, using the name Rick, rather than Richard. Since this appears to be his preferred name, the court will use that appellation. No disrespect is intended.
[3] Since the children would not testify before a Texas grand jury on the sexual assault charges, the District Attorney was not able to proceed and the indictment was "no billed."
[4] Dr. Wheeler has married since December, 1996. She testified in 1997 and again in March, 1999. For consistency the court will use her maiden name throughout.
[5] The respondent mother indicated her willingness at the commencement of the proceedings to plead no lo contendre to the neglect petition, it was only the respondent who wanted to proceed to a trial of all issues.
[6] Felber did not think it of any consequence that the second major allegation was, a) not made by his second wife, but by an unrelated child, and b) not made during the pendency of any divorce.
[7] Although there was testimony about this procedure, the person who administered the procedure did not testify and no attempt was made to establish reliability for its admissibility pursuant to State v. Porter, 241 Conn. 57, 698 (1997) and Daubertv. Merrill Dow Pharmaceuticals. Inc 509 U.S. 579. 113 S.Ct. 2786. (1993).
[8] Tumescence 1. Condition of being swollen or tumid. 2. A swelling. Taber's Cyclopedic Medical Dictionary, 9th Edition (1962).
[9] See also Goldwater v. Postmaster General of the UnitedStates 135 F.R.D 337, 340 (1991) where the Federal court addressed Dr. Felber's request for an "exorbitant hourly rate", reducing his rate and his time. And U.S.A. v. One Parcel ofProperty Located at 31-33 York St. Hartford. Ct. 930 F.2d 139,141 regarding his ten to fifteen minute client examination on the morning of trial to assert a defense of "repression."
[10] This agency is an approved service provider of the Office of Adult Probation. David D'Amora is the Director.
CT Page 5015